Filed 1/12/21  P. v. Shotwell CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089673 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE019335) |
| v. | |
| IMMANUEL PRINCE SHOTWELL, | |
| Defendant and Appellant. | |

Defendant Immanuel Prince Shotwell appeals from his convictions stemming from an assault and carjacking, two separate unlawful taking and driving of vehicles, and dissuading a witness or victim from reporting a crime or causing a complaint to be prosecuted.  On appeal, he contends:  (1) the trial court erred in denying his motion to sever the trial of the counts; (2) the trial court erred in excluding evidence that someone else assaulted the victim and stole his vehicle; (3) the trial court erred in denying his motion for mistrial; (4) the evidence is insufficient to support his conviction for dissuading a witness or victim by threat of force; (5) the trial court abused its discretion

1

in denying his *Romero*[1] motion; (6) the trial court erred in imposing a $5,000 restitution fine under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*); and (7) the cumulative effect of the errors requires reversal. We will order the trial court to correct the abstract of judgment and otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *June 2017 assault and carjacking*

During the March and April 2019 trial, W.M. testified that on June 9, 2017, defendant came to visit him at his residence in a trailer park. Although W.M. did not know defendant by name, W.M. told police he had met defendant twice before. During the visit, defendant promised to give W.M. money to replace a counterfeit $100 bill that defendant's girlfriend, Shayna Wimberly, had given to W.M.[2] Defendant was pleasant; W.M. invited him inside and the two began talking.

W.M. started working on his motorhome and defendant sat down next to him. W.M. agreed to allow defendant to borrow his phone, and defendant got into a heated discussion with the person on the other end of the line. Defendant hung up and demanded W.M. take him to an undisclosed location. Even though W.M. had previously given defendant rides, W.M. refused this time. Defendant then asked if he could use W.M.'s truck, but W.M. again said no. In response, defendant picked up a hammer that was lying nearby and hit W.M. once in the head. W.M. yelled for help and tried to retreat to the back of his motorhome, but defendant again hit him on the head with the hammer. W.M. fell to the floor, and his keys fell out of his pocket. Defendant grabbed the keys, hit W.M. three or four more times, and ran out of the motorhome. W.M. stumbled out of

---

[1]      *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

[2]      Wimberly was defendant's codefendant during trial. Her case is not at issue in this appeal.

his motorhome, watched defendant drive off in W.M.'s truck, and then collapsed. Defendant drove through a locked gate to escape the trailer park.

Police and paramedics arrived around 10:30 p.m. Despite suffering injuries to his head and arm from the assault and fall, W.M. refused to go to the hospital for treatment because the keys to his motorhome were on the keychain defendant stole, and W.M. feared someone would steal his possessions. Photos of W.M.'s injuries were shown to the jury. Police found W.M.'s truck the next day at a local train station.

The night of the incident, W.M. told police the person who had given him the fake $100 bill—Wimberly—was the attacker's "girl." W.M. confirmed this was a true statement during trial. Approximately six weeks after the incident, W.M. met with a police detective but was unable to identify defendant in a photo lineup. W.M. identified defendant and Wimberly during trial.

A neighbor of W.M. testified that on the night of the incident he chased a man who had run out of W.M.'s motorhome. The man jumped into W.M.'s truck. The neighbor reached into the truck to try to pull the key from the ignition, but he had to let go when the man started driving away. The neighbor was unable to identify defendant as the thief.

B. *June 10, 2017 taking of defendant's stepfather's vehicle*

Defendant's mother and stepfather each testified during trial that they were unable to recall the events of June 10, 2017, or that they lied to police about the incident during the investigation. Mother testified the event was fresher in her mind when she spoke to Detective Dave Putnam on August 9, 2017. Mother testified she did not call 911 during the incident because it did not seem like stepfather was in danger.

Putnam testified the mother and stepfather were both cooperative during their interviews on August 9, 2017. In Putnam's opinion, the mother did not appear to be struggling to remember things during the interview. Transcripts of the interviews were provided to the jury, and the jury was shown video excerpts from the interviews.

3

The stepfather told Putnam he was awoken at 3:30 a.m. on June 10, 2017, when defendant arrived at his home. The mother was out of town. Defendant appeared "distraught" and was crying. Defendant said he had assaulted someone and told the stepfather there were people "coming after him." Defendant told the stepfather he had taken the victim's car, despite efforts from the victim's neighbors to stop him and pull him out of the car. Defendant said he "should have just killed [the victim]."

Defendant and the stepfather began arguing. Defendant was holding a knife down toward his side and backed the stepfather into a corner. Although the stepfather did not believe defendant was threatening him with the knife, he still feared for his safety and the safety of his family. The stepfather tried to deescalate the situation and calm defendant down.

In an effort to get defendant out of the family home, the stepfather offered to drop defendant off at a light rail station on the stepfather's way to work. Defendant agreed but then refused to leave the vehicle once they arrived. The stepfather decided to bring defendant to work with him but asked defendant to leave when they got there. Defendant begged for the keys to the stepfather's car. The stepfather knew that if he gave defendant the keys, he would never see the car again.

Several times during the incident, the stepfather called the mother so she could hear. The stepfather was anxious about speaking with the police or testifying, and he feared defendant would find out and retaliate. The stepfather told Putnam he was so afraid for his safety that he had started the process of moving his family to a different home.

The mother told Putnam that defendant called her just after midnight on June 10, 2017. He was "crying and frantic" and said he had beaten a man with a hammer. Defendant was not sure if the victim was dead or alive, but there was "blood everywhere." He had taken the victim's car to a train station and planned to light it on fire. The mother tried to calm him down, but defendant said he did not want to go to

4

prison. Defendant wanted to call the stepfather, but the mother tried to dissuade him from doing so.

A short time later, the stepfather called the mother, and she overheard a struggle. The stepfather sounded "frantic," and told defendant that he loved him. He pleaded with defendant to "put the knife down" and said, "Please don't do this to us." The stepfather later called the mother again and told her defendant had taken off with his car.

The stepfather's car was found in Reno with the engine blown out. When she arrived home, the mother found a hole in the bedroom door. A second police officer testified that during an interview on June 11, 2017, the stepfather said he heard defendant say he had hit someone in the head with a hammer, taken that person's car, and then abandoned it.

C.    *October 12, 2017 taking of V.C.'s car*

V.C. testified that on October 12, 2017, a man named T.A. brought defendant to V.C.'s house to do laundry.[3] Defendant grew upset when he was unable to reach his girlfriend via phone. Defendant asked V.C. to drive him to meet up with his girlfriend. Fearing for her safety, V.C. agreed. On the way, defendant argued with his girlfriend over the phone and grew so angry that he punched the dashboard.

V.C. feared she was being set up. She stopped at a liquor store, left her keys in the ignition, and went inside to get some matches. From inside the store, she watched defendant drive off in her car. She had not given defendant permission to take her car.[4]

Later that day, V.C. communicated with defendant by text and Facebook Messenger asking him to return her car but he refused. The next day, October 13, V.C. saw defendant driving her car. Realizing that he was not going to return it, V.C. called

---

[3]    V.C., a convicted felon and a drug abuser, testified at trial under a grant of immunity.

[4]    V.C. paid $2,000 for her car.

the police that same day to report her car stolen. V.C. waited to call police, stating, "[W]here I come from, we don't do that." V.C. initially lied to the police and said a woman named "Nikki" was the last person she saw near her car.

Defendant communicated to V.C. that she was "out of luck," and posted on Facebook that she was a "rat" and a "snitch" who had threatened to call the police about the stolen car. The post had V.C.'s name and photo on it. Defendant warned he "was going to do something," and asked anyone who saw V.C. to "whoop [her]." T.A. reached out to V.C. and warned she "should be worried."

Police recovered V.C.'s car on October 14, 2017. The radio had been removed and the area under the steering wheel had been "ripped up."

D.    *Intimidation of V.C.*

Defendant was arrested on October 20, 2017, for stealing V.C.'s car. Within hours, defendant called Wimberly multiple times from jail. Recordings of the calls between Wimberly and defendant were played for the jury.

During the first call at 3:33 p.m., Wimberly was traveling by car while defendant gave her directions to V.C.'s residence. Wimberly told defendant, "[N]ow I'm . . . go[ing] over there and try to . . . just holla at her first before I just get her all, you feel me, . . . I'm just gonna try to get at her with respect but if she don't do it then it's gonna get ugly."

After Wimberly arrived at V.C.'s house, defendant asked her to make sure V.C.'s car was there. While outside V.C.'s house, Wimberly started yelling at V.C. that she needed to drop the charges against defendant, saying, "I didn't come [for a] problem, I came here to talk to you real quick. . . . Can you do me one favor blood and please call and be dropping charges! Can you do that for me? I'm going to have my baby in two months so I need my [man] home. You do that?" During the phone call, defendant asked Wimberly to tell V.C. to give her his "stuff" and "clothes." The first call ended.

6

Defendant called back at 3:50 p.m. Wimberly told V.C., who would only talk to Wimberly through the door, that defendant was in jail and asked her to "call and drop the charges." Wimberly asked V.C. if she would call in front of her, but V.C. responded she wanted to wait until Wimberly left her home. Wimberly continued, "[S]o, I'm gonna leave, and then, um, I'll just . . . go [and] check your charges, and if the [charges are] still on there, then I'm just gonna come back and it's gonna be a problem. And . . . next time I'm not comin' with no . . . respect, this house gonna get—I'm gonna run up in her s[***]. And I'm talking about . . . callin' Chelsea, Justin, [and] everybody." Wimberly later told defendant she had threatened to break a window unless V.C. came outside to talk with her. Wimberly described V.C. as "hella scared."

In another call at 4:14 p.m., defendant told Wimberly to give V.C. another half hour, and said, "[D]on't do nothing crazy or stupid." Wimberly replied she was not, and defendant responded, "Let somebody else do that." Wimberly said, "I'm doing what I can," and defendant replied, "I appreciate it. You're doing good."

The next call was at 5:46 p.m. V.C. told Wimberly that she could not drop the charges before trial, but defendant disagreed. Defendant said V.C. should call the district attorney's office and say she had given defendant permission to drive the car and wanted to drop the charges. Wimberly explained she had tried to be friendly with V.C., but she again said V.C. was "hella scared."

Detective Putnam testified V.C. told him a woman named "Nikki" (who V.C. knew through T.A.) had set it up for defendant to steal V.C.'s car. The same woman later came to V.C.'s house asking to have the charges against defendant dropped. Putnam realized the woman was Wimberly. V.C. told Putnam she was not afraid of Wimberly, but she "didn't want to be responsible for something happening to [Wimberly's] baby." V.C. told Putnam she was concerned because Wimberly and defendant "know a lot of people in Del Paso Heights." V.C. felt she could handle herself with respect to Wimberly, but she was worried about defendant. V.C. told Putnam that at first she

7

considered dropping the charges, but she changed her mind. Putnam testified that V.C. appeared "very afraid" and "frantic." V.C. required Putnam to meet her in a public parking lot, so she could flee if Putnam was not actually a police officer. Once V.C. was convinced of Putnam's identity, she "settled down" and talked to him.

Putnam obtained social media information about both defendant and Wimberly. On defendant's Facebook profile, there was a photo of V.C. with the caption, "Watch out for the cop caller a[**] b[****]. Lame a[**] b[****]." The photo was posted at 11:20 a.m. on October 14, 2017, six days before defendant's arrest.

E.    *Defense case*

A.C., Wimberly's cousin, testified at trial that in October 2017, defendant arrived at her house in a black Honda. A woman who the cousin later identified as V.C. was in the passenger seat. The cousin later saw the woman get out of the car and sit down at a nearby bus stop. The cousin testified that she watched defendant try to get the woman back in the car, but the woman refused. The next day, the cousin learned defendant was in jail for stealing the car.

F.    *Charges, conviction,* Romero *motion, and sentencing*

In March 2019, defendant was charged with the carjacking of W.M. while using a deadly weapon (Pen. Code, §§ 215, subd. (a), 12022, subd. (b)(1);[5] count one); assault with a deadly weapon on W.M. (§ 245, subd. (a)(1); count two); defacing of property on June 9, 2017 (§ 594, subd. (a); count three); unlawful taking and driving of the stepfather's vehicle on June 10, 2017 (Veh. Code, § 10851, subd. (a); count four); unlawful taking and driving of V.C.'s vehicle on October 13, 2017 (Veh. Code, § 10851, subd. (a); count five); and dissuading witness and victim V.C. on October 20, 2017

---

**5**      Undesignated statutory references are to the Penal Code.

(§ 136.1, subd. (c)(1); count six). It was further alleged defendant had two prior serious felony convictions.

In April 2019, a jury found defendant guilty on all counts and found true that defendant personally used a deadly or dangerous weapon with respect to counts one and two. In bifurcated proceedings, the trial court found true that defendant had two prior strikes and two prior serious felony convictions.

During the May 2019 sentencing hearing, the trial court denied defendant's *Romero* motion. The court sentenced defendant to state prison for 52 years to life plus 28 years four months. The abstract of judgment lists defendant's sentence as 52 years to life plus 27 years four months.

With respect to fines and fees, the probation report recommended imposing the maximum restitution fines. Defense counsel argued defendant was indigent and asked the court to impose only the minimum fines and fees and not apply any that were not mandatory. Counsel did not mention *Dueñas*, nor did she ask for a hearing to determine defendant's ability to pay any fines and fees. The court imposed various fines and fees, including a $5,000 restitution fine (§ 1202.4, subd. (b)).

DISCUSSION

I

Defendant contends the trial court erred in denying his motion to sever the trial of the counts related to the June 9, 2017 assault and carjacking of W.M. (counts one, two, and three) from the remaining counts. Defendant argues the evidence was not cross-admissible pursuant to Evidence Code section 1101, subdivision (b) between the cases because his violent assault on W.M. was not sufficiently similar to the nonviolent unlawful takings of the stepfather's and V.C.'s vehicles, especially since the stepfather and V.C. knew defendant. Defendant further argues the assault on W.M. was highly inflammatory and was a weak case due to the lack of eyewitness identification. Finally,

9

defendant argues that a limiting instruction could not have mitigated the prejudice. Defendant's contentions are without merit.

A.      *Additional background*

Before trial, defendant moved to sever the counts into four separate trials for each of the incidents (i.e., one for the charges related to W.M., and one for each of the remaining counts). Defendant argued he otherwise would suffer substantial prejudice. He further argued: (1) the evidence of the separate incidents was not cross-admissible; (2) the circumstances of each incident were dissimilar and failed to establish a common plan or scheme; and (3) he would suffer substantial prejudice if the counts were tried together, especially since the cases against defendant were weak. Defense counsel noted W.M. was unable to identify defendant to police during a photo lineup. In addition, defendant noted that his stepfather and V.C. had each given conflicting statements regarding whether they had loaned defendant a car during the incidents in June and October. Finally, the intimidation of V.C. was supported by the jailhouse phones calls, but defendant was never heard threatening V.C. during the calls. Defendant conceded that if any of the counts should be tried together, it would be those related to V.C. (i.e., counts five and six).

The prosecution argued counts five and six were "extremely intertwined" and that the related evidence was cross-admissible. The prosecution further argued the evidence related to counts one through three was cross-admissible as to count four because defendant went to his stepfather's house within hours of assaulting W.M. and confessed to the incident in the trailer park. The evidence would help the jury understand why the stepfather was afraid and had handed defendant the keys to his vehicle.

The trial court denied the motion to sever. The court noted defendant's logic, namely, that all the cases were weak, differed from the typical argument that a strong case was being used to bolster a weak case. The court did not agree that a jury would take all the weak cases and turn them into one strong one. The court further noted counts

10

one through four were connected, given that they were committed within hours. In addition, counts five and six were related because the witness intimidation was related to the substantive count. Finally, counts one, four, and five were all theft offenses, and four and five each appeared to involve whether defendant had permission to take a vehicle. The court indicated it would instruct the jury that it would need to consider each case individually. In sum, the trial court found, under Evidence Code section 352, the joinder of the counts did not result in undue prejudice.

During trial, the jury was instructed pursuant to CALCRIM No. 3515 that each count charged in the case was a separate crime, and that the jury must consider each count separately.

B.    *Defendant has not forfeited the issue on appeal*

The People contend defendant has forfeited the issue because his trial counsel sought four separate trials (one for counts one through three, and one more each for counts four, five, and six), rather than the two trials defendant now seeks. Given that defendant sought severance of the charges during trial, and that the trial court considered the relevant factors under section 954, we will proceed to the merits.

C.    *Analysis*

When separate accusatory pleadings assert offenses that are "connected together in their commission or, [are] of the same class of crimes or offenses, . . . the court may order them to be consolidated. . . ." (§ 954.) The law prefers consolidation or joinder of charges because it promotes efficiency. (*People v. Merriman* (2014) 60 Cal.4th 1, 37.) Offenses are of the "same class" when they possess common characteristics or attributes. (*People v. Leney* (1989) 213 Cal.App.3d 265, 269.) We review a trial court's denial of a motion to sever for abuse of discretion, based on the facts known by the trial court at the time of its ruling. (*People v. Burney* (2009) 47 Cal.4th 203, 237.) Where joinder is statutorily proper, defendant must make a "clear showing of potential prejudice." (*People v. Stanley* (2006) 39 Cal.4th 913, 934.)

11

The determination of prejudice depends upon the circumstances of each case. In noncapital cases, we consider on review the following factors: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are "unusually likely to inflame the jury against the defendant"; and (3) whether a " 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges." (*People v. Sandoval* (1992) 4 Cal.4th 155, 172.) " 'The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence.' [Citation.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221.)

Joinder of the W.M. incident and the other charges was proper here under section 954 because carjacking and vehicle theft charges are of the same class, given that each involves the unlawful taking of a vehicle. (§ 215, subd. (a); Veh. Code, § 10851, subd. (a); *People v. Leney, supra*, 213 Cal.App.3d at p. 269 [offenses are of the same class when they possess common attributes].) In addition, despite defendant's contentions, the incidents with W.M., the stepfather, and V.C. were sufficiently similar to be cross-admissible on the issue of intent. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 ["[i]n order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance" ' "].) In each of the incidents, defendant knew the victim and asked him or her for a ride. The stepfather and V.C. complied, and defendant took the vehicle in both incidents. W.M. refused, and defendant violently assaulted him and then took his vehicle. It would have been reasonable for a trier of fact to infer that defendant harbored the same intent to take the victim's vehicle in each instance when he asked for a ride. The court did not err in finding the incidents to be similar.

In addition, we reject defendant's contention that evidence of the incidents involving the stepfather and V.C. was stronger and therefore would bolster the case

against defendant with respect to the incident involving W.M. Although W.M. was unable to identify defendant in a photo lineup six weeks after the incident, W.M. recognized defendant during the trial. W.M.'s identification of defendant as the assailant was corroborated by evidence that, within hours of the assault on W.M., defendant told his stepfather that he had assaulted someone by hitting him in the head with a hammer, taken the victim's car, and then abandoned it. Defendant similarly told his mother within hours of the incident that he had beaten a man with a hammer. Under the circumstances, there is no " 'extreme disparity' " in the strength of the evidence that would indicate an abuse of discretion. (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1437 (*Ybarra*).)

Moreover, none of the charges were unusually likely to inflame the jury against defendant. There was evidence that the stepfather and V.C. each were scared that defendant would turn violent during the respective incidents. In addition, W.M. was not hospitalized after the assault. Under the circumstances, there was little likelihood that the joinder of the W.M. assault and carjacking charges would inflame the jury in its decision on the vehicle theft and the dissuading a witness or victim charges. In sum, we conclude that defendant has not made the " ' "clear showing of prejudice" ' " required to establish that the trial court abused its discretion. (*Ybarra, supra*, 245 Cal.App.4th at p. 1438.)

Even if the trial court was correct at the time to deny severance, reversal is still proper if a defendant shows that joinder resulted in " 'gross unfairness' amounting to a denial of due process. [Citations.] In determining whether there was such gross unfairness, we view the case as it was tried, including a review of the evidence actually introduced in the trial . . . and other trial related matters, such as the prosecutor's closing argument." (*Ybarra, supra*, 245 Cal.App.4th at p. 1434.) The defendant bears the " 'high burden' " of establishing gross unfairness amounting to a due process violation. (*Id.* at p. 1438.) A defendant "must demonstrate a 'reasonable probability' that the joinder affected the jury's verdicts." (*Ibid.*)

13

Similar to our analysis concluding the trial court did not abuse its discretion, we are not persuaded that defendant has established gross unfairness amounting to a due process violation via his arguments about the relative strength and weakness of the cases, the cross-admissibility of the evidence, or the likelihood that the charges would inflame the jury against defendant. We further note that the jury was properly instructed that each count in the case was charged as a separate crime, and that it must consider each count separately. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [absent a showing to the contrary, jurors are presumed able to understand and to have followed the court's instructions].) Under the circumstances, defendant's contentions are without merit.

II

We next turn to defendant's contention that the trial court erred in excluding evidence that someone else assaulted W.M. and stole his vehicle. We disagree.

A.      *Additional background*

Before trial, the prosecutor informed the court that defendant had told his mother over the phone that prior to the assault Wimberly had worked as a prostitute and W.M. was her client. Neither defense counsel nor the prosecutor indicated that they intended to introduce the statement during trial. During trial, defense counsel nevertheless sought to introduce the statement, along with a similar statement from the stepfather, arguing it would show that Wimberly was engaged in a "business transaction" with W.M. Defense counsel argued the evidence showed that T.A. was Wimberly's pimp because W.M. testified that he knew his assailant and was aware that Wimberly was "his [assailant's] girl." According to defense counsel, it was T.A. who had shown up at W.M.'s motorhome to settle the monetary dispute between W.M. and Wimberly. T.A. then argued with and assaulted W.M. Defense counsel noted T.A. had been identified by V.C., defendant's mother, and defendant's stepfather.

The prosecutor objected to introducing the evidence, arguing no one had mentioned T.A. was the assailant. Indeed, the only mention of T.A. was from V.C., who

14

told police that she met Wimberly through T.A., and when she testified that defendant was introduced to her by T.A. The prosecutor also noted that defendant's mother never mentioned a pimp, and his stepfather had only said defendant was at the scene of the assault "because . . . one of . . . Wimberly's tricks [was] there."

The trial court denied defendant's motion to admit the evidence, reasoning that the evidence was "far too thin" to raise a reasonable doubt of defendant's guilt. The references to T.A. were "fairly discrete" and "don't connect specifically with anybody." Instead, the statements "just dump on . . . Wimberly as being a prostitute." In sum, the evidence was more prejudicial than probative.

B.     *Analysis*

"To be admissible, the third-party [culpability] evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) "In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325.) We review the trial court's decision for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

The theory that T.A. was Wimberly's pimp and assaulted W.M. and stole his vehicle is speculative at best. Although V.C. told police she knew Wimberly through T.A., she never identified T.A. as Wimberly's pimp. Defendant also never told his mother that Wimberly even had a pimp, let alone the pimp's identity. W.M.'s statement

15

that Wimberly was the assailant's "girl" does not imply that T.A. was her pimp because during trial W.M. identified defendant, who was Wimberly's boyfriend, as his assailant. W.M. would have been familiar with defendant because he had met defendant twice before and had previously given defendant rides.

Although evidence that Wimberly was a prostitute might have explained why she had a monetary dispute with W.M., this is not enough to link T.A. to the commission of the crimes. (See *People v. Edelbacher* (1989) 47 Cal.3d 983, 1018 ["evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible"].) The trial court therefore did not abuse its discretion in declining to admit the evidence.

III

Defendant next contends the trial court erred in denying his motion for a mistrial after a witness testified that defendant was on parole. Defendant argues the evidence that he committed the crimes involving W.M. was weak, and the jury would have been prejudiced against him because of his prior crimes. In the alternative, defendant argues for the first time on appeal that the prosecutor committed misconduct. We conclude defendant has forfeited his claim of prosecutorial misconduct and his remaining claims are meritless.

A. *Additional background*

Prior to trial, defense counsel moved to exclude evidence that defendant was arrested while on parole. The court asked the prosecutor whether she intended to introduce such evidence. The prosecutor responded no, but also cautioned that defendant's parole officer was on the witness list, since he was the police officer who interviewed defendant's mother and stepfather. The prosecutor warned that the mother and stepfather were likely to be uncooperative witnesses, with the mother believing that defendant needed drug counseling rather than criminal prosecution. The stepfather similarly indicated he believed much of defendant's behavior was due to drug abuse.

16

Before the start of their testimony, defense counsel and the prosecutor each told the mother and stepfather that they were not to mention defendant's prior criminal record or any potential drug use.

During cross-examination, defense counsel asked defendant's stepfather, "Today you told us that at the time around the period of June 2017, that [defendant] actually lived at your house. Is that correct?" The stepfather responded, "Correct. He was on parole so—I believe he was on parole, so he had an address at our house and the upstairs bedroom." The prosecutor did not raise the issue again during redirect.

After the stepfather's testimony finished, defense counsel moved for a mistrial based on the stepfather's statement that defendant was on parole at the time of the incident. Defense counsel argued she had clearly asked that such information be excluded, and it was highly prejudicial to defendant. She further noted, "[W]e met with the witness first thing this morning to go over the parameters. Nothing was asked of him that would have led him to answer that." The prosecutor responded that the comment was unintentional and no one had followed up on the issue. In addition, the prosecutor stated that the stepfather had been warned against commenting on the issue, and she asked that the testimony be stricken from the record.

The trial court struck the testimony as nonresponsive but denied defendant's motion for a mistrial. The trial court reasoned the testimony was "volunteered" and did not rise to the level of warranting a mistrial.

B. *Analysis*

1. *Denial of motion for mistrial*

A trial court should grant a motion for mistrial " 'only when a party's chances of receiving a fair trial have been irreparably damaged.' " (*People v. Clark* (2011) 52 Cal.4th 856, 990.) Whether a particular incident is so prejudicial that it warrants a mistrial "requires a nuanced, fact-based analysis," which is best performed by the trial court. (*People v. Chatman* (2006) 38 Cal.4th 344, 370.) We review the denial of a

17

motion for mistrial under the deferential abuse of discretion standard. (*Clark, supra*, at p. 990.) As our Supreme Court has explained, a trial court does not abuse its discretion in denying a defendant's motion for mistrial despite a witness's "brief and isolated" reference to the defendant's incarceration status. (*People v. Valdez* (2004) 32 Cal.4th 73, 128.)

As previously discussed, the case against defendant was strong and not closely balanced, given that each of the victims identified defendant as the perpetrator. In addition, defendant's credibility was not at issue, since he did not testify. The stepfather's reference to defendant being on parole was isolated and brief, and the court struck the testimony from the record. There was no further mention of defendant's parole status before the jury from the witnesses or counsel. The fleeting comment was not significant in the context of the entire guilt trial, and the trial court did not abuse its discretion in finding that defendant's chances of receiving a fair trial had not been irreparably damaged.

### 2. *Prosecutorial misconduct*

Despite the prosecutor (and defense counsel) warning the stepfather against alluding to defendant's criminal record, defendant now argues the prosecutor committed misconduct by failing to take sufficient steps to prevent the stepfather from testifying about defendant's parole status in violation of the court's exclusionary order. Even though the testimony arose during cross-examination, defendant argues the prosecutor should have done more because the stepfather was known to be uncooperative.

The People contend defendant has forfeited the claim because he failed to object during trial. As courts have explained, " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Stanley, supra*, 39 Cal.4th at p. 952.)

18

Defendant responds that his motion for mistrial was adequate to inform the trial court that the prosecutor had committed misconduct. We disagree. Defendant's motion was based on the prejudicial nature of the evidence. This would not have indicated to the court that defendant took issue with the prosecutor's conduct, especially since defense counsel noted that she and the prosecutor had met with the stepfather the morning of his testimony to review "the parameters." In addition, defense counsel argued "[n]othing was asked of [the stepfather] that would have led him to answer that." Moreover, the prosecutor moved to strike the testimony. Defendant has therefore forfeited his claim.

IV

We turn next to defendant's contention that his conviction for dissuading a witness or victim must be reduced to a misdemeanor because the evidence was insufficient to establish that he aided and abetted the intimidation of a witness or victim by an implied threat of force. (§ 136.1, subds. (b) & (c).) According to defendant, he never threatened V.C. or instructed Wimberly to do so. While he gave Wimberly directions to V.C.'s home and told Wimberly to tell V.C. to drop the charges, he also told Wimberly to not do anything crazy or stupid.

In considering a claim of insufficiency of evidence, we view the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence, and we do not resolve credibility issues or evidentiary conflicts. (*People v. Wahidi* (2013) 222 Cal.App.4th 802, 804-805, 806 [affirming conviction of dissuading a witness where there was a physical altercation and defendant then implored the witness to "settle this outside the court"].)

Section 136.1 prohibits any attempt to prevent or dissuade a witness to a crime or a victim of a crime from reporting it to a police officer or causing a complaint to be prosecuted. (§ 136.1, subds. (b)(1)-(2), (d).) It is immaterial whether anyone was actually harmed. (§ 136.1, subd. (d).) The crime is a felony if a defendant knowingly

19

and maliciously commits the offense by force or by an express or implied threat of force or violence upon a witness to, or a victim of, a crime. (§ 136.1, subd. (c).)

Attempting to dissuade a witness or a victim is a specific intent crime. (*People v. Young* (2005) 34 Cal.4th 1149, 1210.) In determining whether a defendant's actions or statements constitute an attempt to dissuade a witness or victim, the trier of fact must consider the circumstances in which the defendant's statements or actions are made, not just the statement or action itself. (*People v. Wahidi, supra*, 222 Cal.App.4th at p. 806.) "If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been committed. [Citation.]" (*Ibid.*)

"To be guilty of a crime as an aider and abettor, a person must 'aid[ ] the [direct] perpetrator by acts or encourage[ ] him [or her] by words or gestures.' [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Under a direct theory of aiding and abetting, "the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' " (*Id*. at p. 624.)

Contrary to defendant's contentions, there was evidence that defendant threatened V.C. After learning V.C. might call police about the stolen car, defendant communicated to her that she was "out of luck." He also posted on Facebook that she was a "rat" and a "snitch," and warned he "was going to do something." In addition, he asked anyone who saw her to "whoop [her]." A jury could reasonably conclude these statements threatened violence, especially since V.C. testified that no one calls the police in her neighborhood,

20

and Wimberly and defendant "know a lot of people" in the neighborhood. In addition, T.A. reached out to V.C. and warned her that she "should be worried."

Moreover, a jury could reasonably conclude defendant was encouraging Wimberly to threaten V.C. when she went to V.C.'s home. Defendant called Wimberly within hours of his arrest and gave her directions to V.C.'s home and described V.C.'s car, and a jury could reasonably infer the couple had already talked about what should happen if defendant was arrested. Over the next couple of hours, defendant continually instructed Wimberly to demand that the scared V.C. drop the charges. He did nothing to stop Wimberly when she threatened that it would "get ugly" and "be a problem" if V.C. refused to drop the charges. Although defendant at one point urged Wimberly to give V.C. more time and not do anything "crazy or stupid," in the next breath he admonished, "Let somebody else do that." Defendant then told Wimberly she was "doing good." Under the circumstances, a jury could reasonably conclude defendant was expressly or impliedly threatening V.C. with violence to dissuade her from cooperating with police, and was encouraging Wimberly to do so as well. In sum, defendant's claims are without merit.

V

Defendant contends the trial court abused its discretion in denying his *Romero* motion. We again disagree.

A.    *Additional background*

In May 2019, defendant moved pursuant to *Romero* to strike one of his strikes. Defendant argued he was raised in a neglectful home and his mother had provided him with drugs since he was 11 years old. He was only 19 years old when he incurred his first strike, a 2007 conviction for first degree burglary. According to defendant, he had only entered the unoccupied house, rummaged around, and stolen a burrito because he was hungry. After the conviction, defendant remained addicted to drugs and was homeless. Defendant similarly argued he incurred his second strike, a 2009 conviction

21

for first degree burglary, for entering an unoccupied home in 2008. The homeowner came home during the burglary and confronted defendant. The homeowner prevented defendant from fleeing by chasing and tackling him, and the two began to struggle. Defendant stated he began to regularly use heroin during his subsequent 12-year state prison sentence. Defendant argued he had previously declined jury trials and accepted responsibility for his actions. Although he had requested a jury trial in this case, defendant argued he did so because he was innocent. Defendant asked that the court strike one or more of his prior strikes so he could participate in his children's lives.

During the May 2019 sentencing hearing, the trial court denied defendant's *Romero* motion. Citing *People v. Williams* (1998) 17 Cal.4th 148 and *People v. Carmony* (2004) 33 Cal.4th 367, the court noted it was required to "consider whether, in light of the nature and circumstances of the present felonies and prior serious felony convictions and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law's] spirit in whole or in part" and therefore entitled to leniency. With respect to defendant's prior criminal history, the court found defendant was a recidivist. The court noted defendant had been placed on probation in June 2007 for the first degree burglary conviction, but he promptly violated it in October 2007. Defendant committed the second first degree burglary in 2008 while he was still on probation for the 2007 burglary. Defendant was on parole for the 2009 conviction when he committed the current offenses.

The court also considered defendant's current convictions, noting that the crimes against W.M. were "callous and violent." Defendant thought he had killed W.M. and left him there for dead. The court found defendant's "lack of impulse control and aggressiveness and violence [to be] striking." The court also reasoned that the dissuading a witness or victim count "displays a certain disrespect for the rule of law [and] the justice system." The court found defendant had engaged in an "overall pattern of antisocial behavior" and "appears to be violent." The court noted it had considered

22

defendant "as a whole," including his background and upbringing. However, defendant presented a danger to the public. Under the circumstances, defendant was not outside the Three Strikes scheme.

B. *Analysis*

Defendant argues he falls outside the spirit of the Three Strikes law because he became addicted to drugs at an early age, and his early criminality was comprised of juvenile and misdemeanor offenses. Defendant also argues he was only 19 years old when he committed his first burglary, and the crime was born of hunger. In addition, the 2007 burglary did not involve any violence. He argues he committed the second burglary in 2008 to fund his drug addiction, and he notes the only violence occurred when the victim prevented him from fleeing. With respect to the current offenses, defendant notes that W.M. was not hospitalized, and none of the other crimes involved injuries. And he still would face a lengthy sentence even if the court struck one of the strikes.

In deciding whether to dismiss a prior strike conviction allegation pursuant to *Romero* and section 1385, a trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law's] spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams, supra*, 17 Cal.4th at p. 161.) The circumstances establishing that the criminal falls outside the spirit of the three strikes scheme must be extraordinary. (*People v. Carmony, supra*, 33 Cal.4th at p. 378.) Reversal is justified where the trial court was unaware of its discretion to dismiss a prior strike or considered impermissible factors in declining to dismiss. (*Ibid.*)

We find no abuse of discretion. In considering defendant's motion, the trial court was aware of its discretion. It considered the relevant factors pursuant to *Williams* and *Carmony*, including defendant's social background, criminal history, and current crimes.

23

The court reached its decision in conformity with the spirit of the Three Strikes law, and its decision was neither irrational nor arbitrary.

## VI

Finally, relying on *Dueñas, supra*, 30 Cal.App.5th 1157, defendant argues that due process requires we remand the matter for a hearing on his ability to pay the $5,000 restitution fine imposed. Although defendant asserted his indigence during the May 2019 sentencing hearing, he only asked the court to (1) waive any nonmandatory fines and fees and (2) impose the minimum amount. This was insufficient to put the court on notice that he was requesting an ability to pay hearing based on the due process considerations raised in *Dueñas*, which had been decided in January 2019, more than four months before defendant's sentencing hearing. We therefore conclude defendant has forfeited the issue.[6] (See *People v. Scott* (1994) 9 Cal.4th 331, 351-354 [a defendant must raise a sentencing issue in the trial court in order to preserve it on appeal].)

## VII

Defendant claims the cumulative effect of errors require reversal. As we have found no error, this argument necessarily fails.

## VIII

Despite the trial court's oral pronouncement of defendant's sentence as 52 years to life plus 28 years four months, the abstract of judgment lists defendant's sentence as 52 years to life plus 27 years four months. It has long been held that where there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We will order the error corrected.

---

[6] We note that defendant does not argue on appeal that his trial counsel was ineffective in failing to object based on *Dueñas*.

## DISPOSITION

Consistent with this opinion, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.


                                             _____KRAUSE_____, J.


We concur:


_____ROBIE_____, Acting P. J.


_____MAURO_____, J.

25